**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SAUL RAVITCH | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| CITY OF PHILADELPHIA, CHARLES | : | |
| ISDELL, MARK PESCE, THOMAS | : | |
| BECKER, CHRISTINE DERENICK- | : | NO. 06-3726 |
| LOPEZ, individually and as corporate | : | |
| officials for the City of Philadelphia | : | |
| | : | |
| Defendants. | : | |

**MEMORANDUM**

BUCKWALTER S.J.                                                   March 31, 2009

Currently before the Court is the Motion for Summary Judgment of Defendants City of

Philadelphia (the "City"), Charles Isdell, Mark Pesce, Thomas Becker, and Christine Derenick-

Lopez, both individually and as corporate officials for the City of Philadelphia, and the Response

in Opposition of Plaintiff Saul Ravitch and his Cross-Motion for Sanctions.  Also before the

Court, is Defendants' Cross Motion for Sanctions and Response in Opposition to Plaintiff's

Cross-Motion.  For the following reasons, it is ordered that the Motion for Summary Judgment is

granted in part and denied in part, that Plaintiff's Cross-motion for Sanctions is denied, and

Defendants' Cross-motion for Sanctions is granted in part.

**I.      FACTUAL AND PROCEDURAL HISTORY**

Plaintiff Saul Ravitch has been employed by Defendant City of Philadelphia at the

Philadelphia International Airport ("PIA") since June 14, 1999.  (Pl.'s Compl. ¶ 5.)  He started

his employment as a Public Relations Specialist Trainee, and is currently a Public Relations

Specialist 2.  (Id. ¶ 13.)  His duties as a Public Relations Specialist 2 include:

> [D]eveloping concepts and strategies to promote the airport; perform research
> required to prepare promotional and informational materials; prepare news
> releases, articles for publication, photo captions, bulletins, pamphlets and other
> materials, arrange for newspaper, television, and radio coverage of departmental
> exhibits and ceremonial functions; coordinate the production and distribution of
> informational materials with departmental employees and/or contracted firms;
> establish and maintain liaison with representatives of informational media;
> provide background and factual materials to press, radio, and television
> representatives; represent the airport at meetings, press conferences, and
> ceremonial events.

(Id. ¶ 14.)

Defendant Charles Isdell is the Director of Aviation for the PIA.  (Id. ¶ 7.)  Defendant

Mark Pesce is the PIA Public Relations Manager.  (Id. ¶ 8.)  Defendant Thomas Becker is the

Assistant Director of Aviation-Budget & Central Services for the PIA.  (Id. ¶ 9.)  Defendant

Christine Derenick-Lopez is the Assistant Director of Aviation-Administrative Services for the

PIA.  (Id. ¶ 10.)

### A.    Union Work

In June 2002, Plaintiff became a shop steward for the American Federation of State,

County and Municipal Employees Union ("AFSCME"), Local 2187. (Id. ¶ 15.)  He subsequently

made numerous requests for information and filed numerous grievances over contractual

violations.  Id.  Plaintiff claims that this action prompted retaliation from PIA management,

resulting in his being relocated, denied overtime, stripped of his legitimate duties, assigned

inappropriate tasks outside of his job description, denied the necessary training, and threatened

with discipline should he not perform them.  Id.  Plaintiff also claims that emails sent to him

regarding union matters were opened without his authorization.  (Id. ¶¶ 70-73.)

2

**B.      Automatic External Defibrillators**

In the summer of 2002, Plaintiff joined the Airport Safety Committee.  (Id. ¶ 16.)  In November 2002, the Airport Safety Committee met and discussed maintenance and service of automatic external defibrillators ("AED") at the PIA.  Id.  In September and October 2003, the Airport Safety Committee again discussed safety relating to maintenance of the AEDs.  (Id. ¶¶ 27, 29.)  The committee concluded that the AEDs were in danger of malfunctioning due to deficiencies in the AED maintenance program.  (Id. ¶ 29.)  This fact was reported to Defendant Isdell via the minutes of the Airport Safety Committee.  Id.

On October 27, 2003, Defendant Pesce, Plaintiff's immediate supervisor, assigned him to write a promotional brochure about the PIA's AED program.  (Id. ¶ 28.)  At this time, and again in December 2003, Plaintiff informed Defendant Pesce and Airport Safety Officer John McCourt of his concerns regarding the safety and maintenance of the AEDs.  (Id. ¶ 31.)  In November 2003, the Airport Safety Committee met again to discuss issues relating to the maintenance of the AEDs.  (Id. ¶ 30.)  On March 30, 2004, the Philadelphia Daily News published written by Plaintiff regarding safety problems at the PIA.  (Id. ¶ 34.)  The following day, Defendant Isdell disbanded the Airport Safety Committee.  (Id. ¶ 35.)  A new safety committee was convened by the PIA in the Summer of 2006.  Id.  This action was in response to an unsatisfactory rating of the airport's employee safety program by Philadelphia's Office of Risk Management.  Id.

On January 13, 2005, Robert McCormack, an airline passenger, experienced cardiac arrest and died at the PIA.  (Id. ¶ 39.)  A doctor and nurse at the scene tried unsuccessfully to resuscitate McCormack prior to the arrival of paramedics.  Id.  Records maintained by the PIA determined that several AED's had to be used and failed to resuscitate McCormack.  Id.  On

April 5, 2005, the Daily News published an article regarding McCormack's death**,** which contained quotes from Plaintiff criticizing the failure to maintain the AEDs and his 2003 warning about the safety of the AEDs.  (Id. ¶ 40.)  On April 6, 2005, and again the following night, NBC 10 reported on the death of Robert McCormack and interviewed Plaintiff regarding the failure of the AEDs.  (Id. ¶¶ 41, 42.)  Plaintiff claims that PIA officials retaliated against him three weeks later by terminating his internet access without explanation.  (Id. ¶ 43.)  On June 15, 2005, Defendant Pesce prepared a memorandum recommending Plaintiff for a three-day suspension over the statements made by Plaintiff about the AED program at the PIA and served it on Plaintiff five days later.  (Id. ¶¶ 46, 47.)  Shortly after, the Daily News published an article regarding the disciplinary action recommended by Defendant Pesce against Plaintiff.  (Id. ¶ 48.)

### C.    Internet Usage

In the nine months prior to this action, Defendant Pesce assigned Plaintiff no fewer than fourteen projects requiring internet access.  (Id. ¶ 43.)  In the sixteen months since April 27, 2005, Plaintiff has used the internet workstation in Terminal D at least twelve times.  Id.  This use of the internet workstation requires Plaintiff to pass through a security checkpoint to return to his office.  Id.  Diane Gerace, the only other Public Relations Specialist employed at the PIA, has not had her internet access terminated.  Id.  On June 7, 2005, Plaintiff informed Defendant Pesce of difficulties in completing an assignment caused by denial of internet access and about the treatment he received compared to Ms. Gerace.  (Id. ¶ 44.)  Defendant Pesce instructed Plaintiff to use the internet workstation located in the TIA's Human Resources Office for projects requiring external research.  (Id. ¶ 45.)  Plaintiff continued repeatedly informed Defendant Pesce of the difficulties presented by the removal of his internet access, and complained about his

4

treatment compared to that of Ms. Gerace.  (Id. ¶¶ 50, 51.)  On August 16, 2005, Plaintiff

inquired about the status of his request to have his internet access restored and why it had been

removed initially.  (Id. ¶ 53.)  The following day, Defendant Pesce stated that he played no role in

the removal of Plaintiff's internet access, that he did not know the reason for its removal, and

that Plaintiff's assignments did not warrant consistent internet access.  (Id. ¶ 54.)

On September 19, 2005, Plaintiff again spoke to Defendant Pesce to inform him of

difficulties in completing assignments caused by the removal of his internet access.  (Id. ¶ 57.)

Plaintiff notified Defendant Pesce again, on October 3, 2005, of difficulties in accessing material

from a web link contained in an email that Pesce sent him. (Id. ¶ 61.)  Defendant Pesce

responded to Plaintiff that it was still not necessary for him to have internet access.  (Id. ¶ 62.)

On January 26, 2006, Defendant Pesce sent Plaintiff a facsimile asking that Plaintiff

coordinate with four members of the Custodial Department to be interviewed for the Custodial

Newsletter.  (Id. ¶ 74.)  Defendant Pesce imposed a deadline of February 2, 2006, for the

completion of the newsletter.  Id.  When Plaintiff asked Defendant Pesce for help arranging the

interviews due to his lack of internet access, Defendant Pesce refused to help.  Id.  Although

Plaintiff met the mandated deadline, the newsletter was not published until four months later.  Id.

### D.     Ron White

On February 20, 2003, Ron White, a political fundraiser, was secretly recorded by

governmental investigators discussing a printing contract between PIA officials.  (Id. ¶ 21.) The

recording revealed Ron White instructing Janice Knight, owner of a printing company, to buy

Defendant Isdell lunch to reward him for all the business Isdell provided via the PIA.  (Id. ¶ 22.)

On April 1, 2003, Ron White and Janice Knight were again secretly recorded discussing

5

rewarding Defendant Isdell for providing business to Knight's printing company.  (Id. ¶ 24.)  On

June 6, 2003, Ron White and Defendant Isdell were recorded discussing the printing contract

held by Janice Knight.  (Id. ¶ 25.)  A final recording, performed June 11, 2003, revealed Ron

White berating Defendant Isdell for delays in processing the printing contract for Janice Knight.

(Id. ¶ 26.)

On December 5, 2003, the Daily News published an editorial written by Plaintiff

regarding the federal corruption probe and the PIA.  (Id. ¶ 32.)  On June 24, 2004, the Daily

News published a third editorial written by Plaintiff about the financial costs of cronyism as

practiced by the City of Philadelphia, and more specifically, the PIA. (Id. ¶ 37.)  On November

26, 2004, the Daily News published Plaintiff's fourth editorial about the organizational culture at

the PIA and how it helped precipitate the federal probe.  (Id. ¶ 38.)

### E.    Plaintiff's Philadelphia International Airport Employment

Plaintiff claims that**,** on January 23, 2002, his personal work voicemail was being

monitored by someone else.  (Id. ¶ 17.)  On February 5, 2003, PIA officials restricted access

afforded to Plaintiff by his employment badge, making it more difficult for him to escort media

representatives around the airport.  (Id. ¶ 18.

On February 12, 2003, Virginia L. McDonald, Plaintiff's current supervisor, emailed him

asking him to determine and report in detail about the quantity, cost, and method of inventory

control of the printed materials distributed throughout the PIA. (Id. ¶ 19.)  Shortly afterwards,

Plaintiff filed a grievance over the retaliatory nature of the above assignment.  (Id. ¶ 20.)  In

addition, AFSCME Local 1510 filed a grievance over assigning Plaintiff work outside his normal

duties as a Public Relations Specialist that were normally performed by the members of Local

1510.  Id.  Local 1510 asserted that the assignment infringed upon the work of their members

with the job titles of Inventory Control Technician and Stores Worker.  Id.

On March 23, 2004, Plaintiff tested for the position of Special Events Production

Coordinator at the PIA.  (Id. ¶ 33.)  Plaintiff placed second behind Sabina Clark, another Public

Relations Specialist 2, who was eventually promoted to this position.  Id.  In late June 2005,

Special Events Production Coordinator Sabina Clarke retired, creating a vacancy for her position.

(Id. ¶ 49.)  On August 12, 2005, Personnel Assistant Shauna Bracy informed Plaintiff that Ms.

Gerace declined to interview for the Special Events Production Coordinator position and that

Defendant Pesce preferred to have two candidates from which to choose a replacement.  (Id.

¶52.)  As a result, the promotion list was deemed uncertifiable under civil service regulations,

and Plaintiff was denied the promotion.  Id.  On September 15, 2005, Ms. Bracy informed

Plaintiff that her August 12 email was in error, and that he would be considered for the Special

Events Production Coordinator position along with a top candidate on an "Open Competitive"

list, which would be comprised of outside candidates.  (Id. ¶ 55.)  Ms. Bracy told Plaintiff that he

would interview for the Special Events Production Coordinator position on December 12, 2005.

(Id. ¶ 62.)  On the day of the scheduled interview, however, Ms. Bracy informed Plaintiff that his

interview was cancelled by "in-house" people, rather than Central Personnel.  (Id. ¶ 63.)  On

December 23, Ms. Bracy sent a letter to Plaintiff indicating that the position had been filled by an

outside candidate.  (Id. ¶ 65.)

## F.       The Isdell Letter

On December 20, 2005, KYW Newsradio aired an editorial advocating a state takeover of

the PIA.  (Id. ¶ 64.)  Three days later, Defendant Isdell emailed a rebuttal to KYW Newsradio

General Manager David Yadgaroff, and all PIA employees were carbon copied on the email.  (Id. ¶ 66.)  The next day, Plaintiff sent an email to Defendant Isdell criticizing the email Isdell sent to KYW Newsradio, his management of the PIA, and his relationship to Ron White, calling the PIA the "Ron White International Airport".  (Id. ¶ 67.)  More specifically, Plaintiff criticized Isdelll for fraud, waste, and misuse of public funds by airport officials as subsequently exposed by the federal corruption probe.  Id.  On December 29, 2005, Plaintiff's access to the airport computer network and email system were removed and his further use of those privileges were placed under "administrative review."  (Id. ¶ 68.)  Defendant Pesce stated that he would communicate with Plaintiff by phone and facsimile for the duration of the "administrative review."  Id.  On January 8, 2006, Plaintiff sent an email from his home to the recipients of his December 24th email, clarifying that the previous email was stating only his personal views.  (Id. ¶ 71.)  Nearly a month later, Defendant Pesce served Plaintiff with a memorandum recommending a twenty-day suspension for his December 24 email.  (Id. ¶ 76.)  On May 3, 2006, Defendant Pesce and Derenick-Lopez conducted a disciplinary hearing for Plaintiff relating to the December 24 email and stated that they would come to a decision within a week.  (Id. ¶ 79.)  On June 9, 2006, Defendant Derenick-Lopez issued a twenty-day notice of suspension without pay to Plaintiff that ran from June 19, 2006, through July 14, 2006.  (Id. ¶ 81.)  In the following weeks, Plaintiff appeared on the WPHT-AM radio show hosted by Michael Smerconish to discuss the alleged adverse treatment by the PIA, and numerous editorials and news stories were published concerning Plaintiff's comments and suspension.  (Id. ¶¶ 82-86.)  Plaintiff claims that Defendants continue to assign Plaintiff meaningless and ministerial tasks that do not reflect the level of knowledge or experience he possesses in his capacity as Public Relations Specialists.  (Id. ¶ 87.)

8

Plaintiff filed his Complaint on August 22, 2006 seeking compensatory and punitive damages stemming from what he alleges were Defendants' violation of his constitutional, statutory, and civil rights attendant to his employment as a Public Relations Specialist at the PIA. There are two Counts within the Complaint: (1) Plaintiff alleges that Defendants Isdell, Pesce, Becker, and Derenick-Lopez, in their individual capacities, violated his First and Fourteenth Amendment rights by disciplining him for stating his opposition to Defendants' wrongdoing; and (2) Plaintiff alleges that the City of Philadelphia, and the other named Defendants, in their official capacities, violated 42 U.S.C. § 1983, because the City condoned the named Defendants' behavior with respect to his treatment while working for the PIA and his suspension.  On November 2, 2006, Defendants filed a motion to dismiss, which was denied by this Court on July 19, 2007.  Defendants then filed this motion for summary judgment on June 6, 2008.  Plaintiff responded on June 19, 2008 and also filed a cross- motion for sanctions.  Defendants replied to Plaintiff and filed their own cross-motion for sanctions and response in opposition to Plaintiff's cross-motion for discovery sanctions on June 30, 2008.

Defendants seek the following relief in their cross-motion: (1) that Plaintiff and his counsel return to Defendants, the originals and all copies of the attorney-client privileged emails listed in the Defendants' Statement of Facts in their Response and Cross-Motion (as well as any that Plaintiff may be secretly withholding), and that Plaintiff be precluded from using or disclosing any information from such documents; (2) that the record in this case be sealed to the extent it contains such privileged communications due to Plaintiff's filing of same with his Cross-Motion for Sanctions; and (3) that Plaintiff and his counsel be ordered to pay Defendants'

attorney fees and costs for their time and effort required to file their Cross-Motion for Sanctions relating to these privileged documents.

## II.   STANDARD OF REVIEW

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c).  A factual dispute is "material" only if it might affect the outcome of the case. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For an issue to be "genuine," a reasonable fact-finder must be able to return a verdict in favor of the non-moving party.  Id.

On summary judgment, it is not the court's role to weigh the disputed evidence and decide which is more probative, or to make credibility determinations.  Boyle v. County of Allegheny, Pa., 139 F.3d 386, 393 (3d Cir. 1998) (citing Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co. Inc., 998 F.2d 1224, 1230 (3d Cir. 1993).  Rather, the court must consider the evidence, and all reasonable inferences which may be drawn from it, in the light most favorable to the non-moving party.  Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986) (citing United States v. Diebold, Inc., 369 U.S. 654, 655 (1962)); Tigg Corp. v. Dow Corning Corp., 822 F.2d 358, 361 (3d Cir. 1987).  If a conflict arises between the evidence presented by both sides, the court must accept as true the allegations of the non-moving party, and "all justifiable inferences are to be drawn in his favor."  Anderson, 477 U.S. at 255.

Although the moving party bears the initial burden of showing an absence of a genuine issue of material fact, it need not "support its motion with affidavits or other similar materials negating the opponent's claim."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  It can meet

its burden by "pointing out . . . that there is an absence of evidence to support the nonmoving

party's claims."   Id. at 325.  Once the movant has carried its initial burden, the opposing party

"must do more than simply show that there is some metaphysical doubt as to material facts."

Matsushita Elec., 475 U.S. at 586.  "There must . . . be sufficient evidence for a jury to return a

verdict in favor of the non-moving party; if the evidence is merely colorable or not significantly

probative, summary judgment should be granted."   Arbruster v. Unisys Corp., 32 F.3d 768, 777

(3d Cir. 1994), abrogated on other grounds, Showalter v. Univ. of Pittsburgh Med. Ctr., 190 F.3d

231 (3d Cir. 1999).

## III.   DISCUSSION

The current case is a civil rights action in which Plaintiff seeks compensatory and

punitive damages arising from Defendants' alleged violation of his constitutional, statutory, and

civil rights, attendant to his employment as a public relations specialist with the PIA.  Plaintiff

also requests sanctions against Defendants for their fraudulent concealment of material and

relevant documents.

Defendants argue that Plaintiff fails to contest their arguments in support of summary

judgment with regard to his constructive discharge, conspiracy, and Fourteenth Amendment

claims.[1]  Plaintiff's only remaining claim, Defendants argue, is a First Amendment retaliation

claim under 42 U.S.C. § 1983. They assert that this claim fails because Plaintiff does not  present

evidence to support his claims of individual and municipal liability, he admits facts that are

counter to controlling precedent, and relies on attorney-client privileged emails, which were

---

[1] The Court notes that Plaintiff's inclusion of the Fourteenth Amendment, conspiracy, and constructive discharge seem to be used only in support of his claim of a First Amendment violation.  Therefore, the Court will not address these issues as claims against Defendants.

mysteriously obtained, and should not be admissible and should be immediately returned to Defendants.

> **A.   Whether Defendants Isdell, Pesce, Becker, and Derenick-Lopez, in Their Individual Capacities, Violated Plaintiff's Rights Under the First and Fourteenth Amendments**

In conducting investigations into the PIA's alleged wrongdoing, and by stating his opposition to Defendants' expenditures, safety concerns, and allegedly fraudulent actions in violation of federal, state, and local laws and the confirming regulations, Plaintiff claims to have engaged in expression protected by the First Amendment of the United States Constitution. (Pl.'s Compl. ¶ 89).  Plaintiff believes that the First Amendment protects him, as a public employee, from retaliation by the PIA. (Pl.'s Opp. Mot. Summ. J. 26 (citing, see Green v. Phila. Housing Auth., 105 F.3d 882 (3d Cir. 1997))).  He argues that an employee may not be adversely treated for the expression of ideas on any matter of public concern unless the public employer's interest in the efficient and effective fulfillment of its responsibilities to the public outweighs the employee's interest in free expression of the ideas.  Id. (citing Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996); Watters v. City of Phila., 55 F.3d 886 (3d Cir. 1995)).  Plaintiff contends that, by punishing and constructively terminating him, Defendants Isdell, Pesce, Becker, and Derenick-Lopez, in their individual capacities, have violated his rights pursuant to the First and Fourteenth Amendments of the United States Constitution, as well as 42 U.S.C. § 1983.  (Id. ¶ 91).

Defendants respond that Plaintiff's First Amendment claims fail under a substantive analysis of the undisputed facts showing that the City was entitled to discipline him.  (Defs.' Mem. Supp. Mot. Summ. J., 17).

The Supreme Court in <u>Pickering v. Bd. of Ed.</u>, 391 U.S. 563 (1983), set forth a balancing test to determine whether the government had a legitimate interest in regulating the speech of its employees that "differs significantly from those it possesses in connection with regulation of the speech of the citizenry in general." <u>Id.</u> at 568.  The <u>Pickering</u> balancing test considers "whether the statement impairs discipline by superiors or harmony among co-workers, has a detrimental impact on close working relationships for which personal loyalty and confidence are necessary, or impedes the performance of the speaker's duties or interferes with the regular operation of the enterprise." <u>Rankin v. McPherson</u>, 483 U.S. 378, 388 (1987).  The test also takes into account the extent of authority entailed in the employee's position.  <u>Id.</u> at 390.

The Third Circuit, in evaluating First Amendment retaliation claims in light of the <u>Pickering</u> balancing test, dictated that a reviewing court make the following inquiries: (1) was the employee's speech on a matter of public concern, and if so, did his interest in the speech outweigh the governmental interest in providing efficient and effective service; (2) was the speech a substantial or motivating factor in the alleged retaliatory action; and, (3) would the employer have taken the adverse action had the employee not spoken out publicly.  <u>Curinga v. City of Clairton</u>, 357 F.3d 305, 310 (3d. 2004).  The second and third factors are questions of fact for a jury to decide, while the first is a question of law.  <u>Id.</u>  As such, the Court focuses on the public concern and governmental interest components of the first inquiry.

13

### 1.      Public Concern

In order to satisfy the first prong in <u>Curinga</u>, Plaintiff must establish that his email was protected and that the contents were about a matter of public concern.[2]  "A public employee's speech involves a matter of public concern if it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.' " <u>Green v. Phila. Housing Auth.</u>, 105 F.3d 882, 885-86 (3d Cir.1997) (quoting <u>Connick</u>, 461 U.S. at 146).  Courts determine whether a matter addresses a public concern by considering the content, form and context, of a given statement based upon the record as a whole.  <u>Connick</u>, 461 U.S. at 148.

In the factually analogous case of  <u>Monsanto v. Quinn</u>, 674 F.2d 990 (3d. Cir. 1982), Liston Monsanto brought suit against his employer, the Tax Division of the Virgin Islands Department of Finance due to his ninety day suspension without pay.  <u>Id.</u> at 991.  At the time of his suspension, the plaintiff wrote a series of letters to the Commissioner of Finance and the Tax Division Director in which he complained that the Division was poorly managed and that the morale of its employees was low.  He also criticized the structure of the Division, and sought the elimination of certain employment positions.  <u>Id.</u>  In at least one letter, the plaintiff alleged that several of the employees of the Tax Division had attempted to defraud the government by filing fraudulent tax returns, and that the problems in the Division were impairing the effectiveness of

---

[2] "[E]xcept for certain narrow categories deemed unworthy of full First Amendment protection-such as obscenity, 'fighting words' and libel - all speech is protected by the First Amendment."  <u>Eichenlaub v. Twp. of Indiana</u>, 385 F.3d 274, 282-283 (3d Cir. 2004) (<u>citing</u> <u>R.A.V. v. St. Paul</u>, 505 U.S. 377, 382-90 (1992)).  That protection includes private expression not related to matters of public concern.  <u>See</u> <u>Capitol Square Review & Advisory Bd. v. Pinette</u>, 515 U.S. 753, 760 (1995); <u>Connick v. Myers</u>, 461 U.S. 138, 147 (1983); <u>United Mine Workers of Am. Dist. 12 v. Ill. State Bar Ass'n</u>, 389 U.S. 217, 223 (1967).

the Division's tax-collecting operations.  Id.  Copies of the letters were also sent to the Governor and the Lieutenant Governor of the Virgin Islands.  Id.

On August 15, 1979, a broadcaster on a local radio show, summarized and discussed the contents of letters.  Id.  In response to the broadcast, the Commissioner of Finance released a statement in which he attacked the broadcast and defended his staff and personal integrity.  Id.  Only a few days later, the Commissioner initiated dismissal proceedings against the plaintiff claiming that the plaintiff's actions were "character assassinations" of co-workers that refused to participate in his disruptive actions.  Id. at 991-92.

The court found a First Amendment violation, noting that:

The First Amendment balancing test can hardly be controlled by a finding that disruption did occur.  An employee who accurately exposes rampant corruption in her office no doubt may disrupt and demoralize much of the office.  But it would be absurd to hold that the First Amendment generally authorizes corrupt officials to punish subordinates who blow the whistle simply because the speech somewhat disrupted the office . . .  The point is simply that the balancing test articulated in Pickering is truly a balancing test, with office disruption or breached confidences being only weights on the scales.

Id. at 996.

In this case, the record contains numerous instances of Plaintiff sending emails and letters and writing editorials about different aspects of working at the PIA.  As we stated previously, many of the issues Plaintiff addresses are of public importance.  More specifically, the issues of corruption and inefficiencies in his December 24, 2005 email, which Defendants argue is the reason for Plaintiff's suspension, are matters of public importance.  Therefore, the Court agrees with Plaintiff that the speech in the email regarding the mismanagement of the PIA concerns

political and social matters that could potentially affect the public community.[3]  A different

finding might otherwise "inhibit and discourage divulgence of information which elected

officials, the press, and the public need to uncover and eliminate waste and inefficiency."

Monsanto v. Quinn, 647 F.2d 990, 997 (3d Cir. 1982).

### 2.    Government Interest

Next, Plaintiff must demonstrate that his interest in speech outweighs the state's interest

as an employer in promoting the efficiency of the public services it provides through its

employees.  Defendants argue that courts have long held that employees serving the government

in positions involving duties as a "spokesperson" or "assistant director of public information"

have limited First Amendment protections because the government "has a vital interest in

maintaining governmental effectiveness and efficiency."  (Defs.' Mem. Supp. Mot. Summ. J. 18

(citing Branti v. Finkel, 445 U.S. 507, 517-18 (1980))).

In support of their argument, Defendants make several arguments, none of which the

Court finds convincing.  First, they rely on Brown v. Trench, 787 F.2d 167 (3d. Cir. 1986),

wherein a former county assistant director of public information brought an action challenging

her discharge.  Id. at 168.  Plaintiff was affiliated with the Republican Party.  Id.  On January 3,

1984, her employment with Bucks County was terminated by the newly elected Democratic

Bucks County Commissioner.  Id.  The other people fired at this time were Republicans and all

of the people hired were Democrats.  The court held that Brown, whose job included preparing

---

[3] "This conclusion is supported by the fact that issues raised by Plaintiff were deemed important enough to be the subject of numerous news reports."  Monsanto, 674 F.2d 990, 997 (3d Cir. 1982).

press releases, writing speeches for Commissioners, and communicating with legislators, could be dismissed because of her political affiliation.  Id. at 172.

Defendants argue that, using the same analysis, the twenty-day suspension Ravitch received is certainly entitled to even further deference under a First Amendment analysis.  The Court disagrees.  The court in Brown,[4] reasoned through the lens of political affiliation and determined that Brown's "position is one which cannot be performed effectively except by someone who shares the political beliefs of the Commissioners."  Id. at 170.  Therefore, she could be dismissed because her beliefs did not correspond to the beliefs of the Democratic party.  Id.  Whether a person affiliates with a political party is a choice, whereas speaking out against corruption as a public employee is a right.  Plaintiff Ravitch was suspended because he exercised his First Amendment right by writing an email that ran counter to the thoughts of his supervisor.  In contrast, Brown was terminated not for exercising her right to speak in the interest of the

---

[4]Courts outside of this circuit have considered a variety of government positions to determine whether they fall within the patronage exception of Branti.  Employees in the following positions have been found subject to removal based on their political affiliation: see, e.g. Sweeney v. Bond, 669 F.2d 542 (8th Cir.1982) (fee agent);  see, e.g. Nekolny v. Painter, 653 F.2d 1164 (7th Cir.1981) (Senior Citizens Coordinator);  see, e.g. Ecker v. Cohalan, 542 F. Supp. 896 (E.D.N.Y. 1982) (Deputy Parks Commissioner);  see, e.g. Joyner v. Lancaster, 553 F. Supp. 809 (M.D. N.C. 1982) (Deputy Sheriff);  see, e.g.  Brunton v. U. S., 518 F. Supp. 223 (S.D. Ohio 1981) (Director of the Farmer's Home Administration);  see, e.g.  Garretto v. Cooperman, 510 F. Supp. 816 (S.D.N.Y. 1981) (Worker's Compensation Law Judge);  see, e.g. Bavoso v. Harding, 507 F. Supp. 313 (S.D. N.Y.1980) (City Corporation Counsel).  Employees in the following positions were found not subject to dismissal under Branti:  see, e.g. Gibbons v. Bond, 523 F. Supp. 843 (W.D. Mo. 1981) (Branch Manager for the State Department of Revenue); see, e.g. Barrett v. Thomas, 649 F.2d 1193 (5th Cir. 1981) (Deputy Sheriff); see, e.g. DeLaCruz v. Pruitt, 590 F. Supp. 1296 (N.D. Ind. 1984) (Supervisor of a County Branch of the Auditor's Office); see, e.g. Gannon v. Daley, 561 F. Supp. 1377 (N.D. Ill. 1983) (administrative assistant to the State's Attorney of Cook County); see, e.g. Crisp v. Bond, 536 F. Supp. 137 (W.D. Mo. 1982) (Assistant Director of the Division of Motor Vehicle and Drivers Licensing); see, e.g. Visser v. Magnarelli, 530 F. Supp. 1165 (N.D.N.Y. 1982) (City Clerk).

public, but to maintain political homogeneity in a workplace.  In short, political affiliation can be used, under proper conditions, as a justification for dismissal, while speech that seeks fairness and efficiency may not.

In their second argument, Defendants point to Leslie v. Phila. 1976 Bicentennial Corp., 343 F. Supp. 768 (E.D. Pa. 1972), a civil rights action that was brought by a former coordinator of community development of corporate instrumentality of the state for the purposes of planning a bicentennial celebration.  The court found that unlike the situation in Pickering, the plaintiff's duties required a high degree of cooperation and loyalty with her coworkers and supervisors, and yet, her actions undermined staff morale making an effective working relationship impossible. Id. at 777.  The plaintiff's disparaging public pronouncements not only impeded the proper performance of her duties as Coordinator of Community Relations, they made it impossible.  Id. And, in contrast to Pickering, the plaintiff's statements, because of their divisive effect upon the community, interfered with the regular operation of the Bicentennial Corp., which needed public good will if it was to succeed.  Id.  Using the Pickering balancing test, the court had no doubt that the issues raised by the plaintiff were of genuine public concern and that a difference of opinion was a matter of public interest.  Id.  However, the court found that plaintiff alienated herself from her coworkers to the point where she "could no longer be effective"at her "exceptionally sensitive duties."  Id.

In contrast, Defendants, in this case failed to produce evidence showing how Plaintiff's position within the PIA was so "exceptionally sensitive" as to have had his actions render him "no longer effective," for the length of his suspension.  Defendants argue that Plaintiff admits that the speech for which "he now seeks protection completely undermined [his] job duties."

18

(Defs.' Mem. Supp. Mot. Summ. J. 22).  More specifically, Defendants claim that Ravitch admits that:

> (1) his generation of negative media coverage undermined his ability to effectively work with colleagues and managers, which was a job requirement (Defs.' Mem. Supp. Mot. Summ. J., Ex. B. Ravitch Dep. at 34:16-19, Feb. 27, 2008); (2) some airport managers, including one specifically identified by Ravitch, has less trust in him and were "a little uncomfortable dealing with him" on Public Relations matters, as a result of his activities (Id. at 176:2-6, 177:5-12, 186:16-19, 188:22-24); (3) Ravitch's ability to take sensitive Public Relations assignments was limited by his negative media efforts (Id. at 187:10-22); (4) the City has a right to require employees to treat their superiors and co-workers with respect, and a right to discipline employees for flagrant disrespect and insubordinate conduct. (Id. at 61:8-13, 66:15-21, 68:12-18).

Id. at 22-23.  "As a result of these admissions - which confirmed the defendants' impressions and reasoning for disciplining him – Ravitch cannot now deny that his speech undermined his Public Relations department and negatively affected his ability to do his job."  Id. at 23.

Upon independent review, the Court does not agree that Defendants' evidence establishes that Plaintiff's letter had the effect of materially and substantially disrupting the operations of the PIA, and more specifically, his position as Public Relations Specialist 2, so as to warrant a conclusion that his letter constitutes unprotected speech.  The Court recognizes the plethora of testimony and evidence that shows that Plaintiff was active in voicing his opinion.  However, the Court finds that no actual disruption to Plaintiff's work performance occurred.[5]  A Public Relations Specialist is someone who "disseminates positive information about the airport. . .and respond[s] to public concerns in a way that creates a favorable impression."  (Id. at 34:8-13).

---

[5]Plaintiff argues that "in cases such as this involving speech on matters of significant public concern, a showing of *actual disruption* is required." (Pl.'s Opp. Defs.' Mot. Summ. J. 30 (citing Zamboni v. Stamler, 847 F.2d 73, 79 (3d Cir. 1988) (emphasis added)), see also Am. Postal Workers Union v. U.S.P.S., 830 F.2d 294, 303, n.12 (D.C. Cir. 1987)).

When asked if he could write an article on how the PIA uses funding efficiently, Plaintiff responded, "I could write it if they [PIA Officials] gave me the facts, when I'm writing something for the airport, my personal views are put aside. So if they gave me information about our finances or how it was being run, I would try to put the best spin on it." (Id. at 188:6-14).

Defendants have failed to show how Plaintiff's beliefs actually impacted on his ability to perform as a Public Relations Specialist.  Although Plaintiff may have made co-workers feel uncomfortable talking to him, and others little less trusting of him, neither limited his ability to perform nor should they limit him in the future.  The decision to temporarily suspend rather than dismiss him leads the Court to believe that the PIA recognizes that he maintains a working relationship with his fellow employees and supervisors that makes the performance of his job possible.

Defendants make one last effort to tip the scale in their favor by arguing that insubordination and challenges to a supervisor's integrity are generally not protected by the First Amendment.  (Defs.' Mem. Supp. Mot. Sum. J. 20 (citing Roseman v. Indiana Univ. of Penn., 520 F.2d 1364, 1368 (3d Cir. 1975))).  In support of this position, Defendants rely on Mills v. Steger, 179 F. Supp. 2d 637 (W.D. Va. 2002), wherein a former manager of a public radio station, owned by a state university, sued officials, alleging a First Amendment violation because he was terminated for criticizing their programming decisions in a letter sent to his superior and the rest of the station staff.  Id. at 639-40.  The court stated that "[a]n employee like [plaintiff], whose job involves public contact, cannot mishandle his public relations duties by creating controversies, challenging his supervisors, and insulting listeners, and then claim protection under the First Amendment."  Id. at 648.

20

Although the court in <u>Mills</u> properly applied the balancing test, the facts are distinguishable from the present case for two reasons: (1) the plaintiff questioned his superior's reasoning, not reputation for dishonesty and impropriety; (2) and the plaintiff completely alienated himself from his listeners and almost destroyed his station's ability to fund raise from those listeners after calling them "opera Nazis." <u>Id.</u>  The Court agrees that, "[a] government employer. . . is entitled to insist upon the legitimate day-to-day decisions of the office without fear of reprisals." <u>Id.</u>  However, this case is not about the daily decisions of the PIA.  It is about whether an employee has the right to speak out against what he perceives to be potentially criminal improprieties.  Further, as the Court has already found, Plaintiff, despite his email, maintains his ability to perform his specific job functions.  The radio-station, on the other hand, ran based on the generous donations of its listeners.  The plaintiff's remark, calling them "opera Nazis," could have damaged the radio station's ability to fund raise to the point where the station could not survive.

 For all of these reasons, the Court finds that Plaintiff's writing constituted protected speech which could not furnish the basis for the suspension imposed.  As such, we leave it for a jury to decide the second two <u>Curinga</u> factors of whether the speech was a substantial or motivating factor in the alleged retaliatory action and whether the employer would have taken the adverse action had the employee not spoken out publicly.  <u>Curinga</u>, 357 F.3d at 310.

**B.      Qualified Immunity**

Defendants next argue that qualified immunity protects the individual defendants against Plaintiff's First Amendment claims against them. (Defs.' Mem. Supp. Mot. Summ. J. 26).

Furthermore, Defendants contend that Plaintiff has failed to identify any evidence that voids the individual Defendants' entitlement to qualified immunity.  Id.  Defendant continues:

> With regard to First Amendment cases, "where a sophisticated balancing of interests is required to determine whether the plaintiffs' constitutional rights have been violated, only infrequently will it be "clearly established" that a public employee's speech on a matter of public concern is constitutionally protected . . . This is largely because the Pickering balancing test. . .which is used to weigh the employer's and the employee's interests in First Amendment retaliation cases, is 'subtle, difficult to apply, and not well-defined.'" DeMeglio v. Haynes, 45 F.3d 790, 806 (4th Cir. 1995).

(Defs.' Mem. Supp. Mot. Summ. J. 26-27).  Plaintiff responds that he has provided substantial evidence for a reasonable fact finder to infer that Defendants' conduct violated clearly established constitutional rights, and reasonable officials in Defendants' positions would have known that their conduct violated such Constitutional rights.  (Pl.'s Opp. Mot. Summ. J. 37).

The doctrine of qualified immunity shields government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known."  Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982).  Restated more precisely, "whether an official protected by qualified immunity may be held personally liable for an allegedly unlawful official action generally turns on the 'objective legal reasonableness of the action assessed in light of the legal rules that were clearly established' at the time it was taken."  Anderson v. Creighton, 483 U.S. 635, 639 (1987) (quoting Harlow, 457 U.S. at 818-819); see also Pro v. Donatucci, 81 F.3d 1283 (3d Cir. 1996).  As such, the qualified immunity analysis breaks down into two issues.  First, to determine whether a right has been "clearly established," the Third Circuit has demanded "some but not precise factual correspondence between relevant precedents and the conduct at issue."  In re City of Phila.

Litigation, 49 F.3d 945, 970 (3d Cir. 1995), citing Ryan v. Burlington County, 860 F.2d 1199,

1208-09 (3d Cir. 1988) (quotations omitted).

Second, the inquiry of what constitutes "objective legal reasonableness," requires the

court to engage in an examination of the information possessed by the individual at the time and

how a reasonable official would have reacted with that information.  Anderson, 483 U.S. at 641;

see also Reitz v. County of Bucks, 125 F.3d 139, 147 (3d Cir. 1997) (the court must decide

whether under the existing law an officer reasonably could have believed the conduct to have

been permissible).  The first test presents a purely legal question for the trial court to determine

as a matter of law, while the second inquiry requires application of the law to the particular

conduct at issue.  Reitz, 125 F.3d at 147.

In McGreevy v. Stroup, the Third Circuit considered a claim of qualified immunity in the

context of a First Amendment challenge.  A school nurse filed a civil rights action under 42

U.S.C. § 1983 against a school district and school district officials claiming that her First

Amendment rights were violated when she received a grossly unsatisfactory employment rating

in retaliation for her advocacy on behalf of two disabled students.  413 F.3d 359, 361 (3d Cir.

2005).  The district court held that "because Pickering's constitutional rule turns upon a

fact-intensive balancing test, it can rarely be considered 'clearly established' for the purposes of

the Harlow qualified immunity standard."  Id. at 366.  The Third Circuit disagreed, noting 'where

the [Pickering] balancing factors weigh heavily in favor of the employee, the law is clearly

established, and qualified immunity is therefore unavailable."  Id. 413 F.3d at 366 (citing

Ceballos v. Garcetti, 361 F.3d 1168, 1181 (9th Cir. 2004).  "Indeed, the Supreme Court has made

clear that 'officials can still be on notice that their conduct violates established law even in novel

factual circumstances." McGreevy, 413 F.3d at 366 (citing Hope v. Pelzer, 536 U.S. 730, 741

(2002)). In other words, when the balance of cognizable interests weighs so heavily in an

employee's favor, our cases make plain that the law is clearly established.  See Czurlanis v.

Albanese, 721 F.2d 98, 107 (3d Cir. 1983) (holding that a county employees' speech at a board

meeting was constitutionally protected because it was a matter of public concern and because the

county was unable to set forth a sufficient countervailing interest).

Upon review of the facts, and in light of our discussion on the Pickering balancing test,

we find that despite Defendants' acting upon the advice of the City's Counsel, Plaintiff has a

sufficiently clear, protected right to speak.  We therefore hold that qualified immunity must be

denied.

**C.    Whether the City of Philadelphia and the Individual Defendants, in Their
         Official Capacities, are Liable under 42 U.S.C. § 1983**

Plaintiff maintains that the PIA knew that individual Defendants engaged in retaliatory

actions against employees to cover-up wrongdoing, waste, and fraud committed by the individual

Defendants or those for whom the individual Defendants are responsible.  (Pl.'s Opp. Mot.

Summ. J. 41).  He claims that the following instances provide substantial evidence for a

reasonable fact finder to infer that the PIA is liable under a deliberate indifference theory: (1)

Defendant Isdell, the policymaker at the PIA, knew of and acquiesced to the retaliation and

harassment meted out by the individual Defendants against the Plaintiff; (2) Defendants' pattern,

practice, and policy of retaliation instances when the PIA employees exercise their rights to First

Amendment free speech; (3) Defendants' pattern, practice, and policy of actively concealing

evidence of retaliation against employees who exercise their First Amendment free speech rights;

(4) Defendants established a longstanding pattern, practice, and policy of improperly

investigating Plaintiff because he exercised his free speech rights; (5) Plaintiff was the only

employee ever disciplined at the PIA for a violation of the PIA Media Policy; (6) the individual

Defendants failed to follow their own policies and procedures when disciplining Plaintiff for

alleged infractions of "insubordination," the "Airport's Media Policy," and the "City of

Philadelphia Internet/E-mail Policy," all of which require progressive disciplinary action that is

significantly less severe than that taken against Plaintiff; (7) Plaintiff repeatedly submitted

editorials critical of management at the PIA, yet no disciplinary action was taken until he was

personally critical of Defendant Isdell in his December 24, 2005 email; and (8) in determining

whether Plaintiff was exercising his rights to free speech, Defendants retaliated and harassed

Plaintiff for submitting "negative" information to the media defined by Defendants as

"inaccurate."  Id.

Defendants, in turn, respond that Plaintiff is unaware of an unconstitutional policy,

practice, or custom which motivated the individual Defendants' conduct.  (Ravitch Dep.

223:5021, 224:23-225:2).  Defendant believes that Plaintiff must provide "specific and concrete

evidence that: (1) the defendant municipality was aware of the allegedly unconstitutional

conduct; (2) such conduct was the proximate cause of Ravitch's injuries; and (3) the municipality

failed to remedy the situation." (Defs.' Reply Br. 6 (citing Bd. Of County Comm'rs of Bryan

County, Ok. v. Brown, 520 U.S. 397, 404-405 (1997))).  Defendant continues that Plaintiff's

theory is based solely upon inapposite case law and blanket accusations which are unsupported

by any specific citations to the record.  Therefore, at this stage in the litigation, summary

judgment should be granted in their favor as to municipal liability.

25

In the seminal case of <u>Monell v. Dept. of Soc. Serv.</u>, 436 U.S. 658 (1978), the United States Supreme Court confirmed that "Congress did intend municipalities and other local government units to be included among those persons to whom section1983 applies," but emphasized that, "a municipality cannot be held liable under section 1983 on a *respondeat superior* theory." <u>Id</u>. at 690-91. To establish section 1983 liability on such a governing body, Plaintiff must identify either a "policy, statement, ordinance regulation or decision officially adopted and promulgated by that body's officers," or "constitutional deprivations visited pursuant to governmental 'custom' even though such a custom has not received formal approval through the body's official decision making channels." <u>Id</u>. at 690-691. The Third Circuit refined these definitions and explained that policy or custom may be established (1) "[w]hen a decisionmaker possess[ing] final authority to establish municipal policy with respect to the action issues an official proclamation, policy or edict," or (2) through a "course of conduct . . . when, though not authorized by law, such practices of state officials [are] so permanent and well-settled as to virtually constitute law." <u>Andrews v. City of Phila.</u>, 895 F.2d 1469, 1480 (3d Cir. 1990).

Deliberate indifference is the result of "a deliberate choice to follow a course of action [that] is made from among various alternatives' by city policymakers." <u>City of Canton v. Harris</u>, 489 U.S. 378, 389 (1989) (quoting <u>Pembaur v. Cincinnati</u>, 475 U.S. 469, 483-84 (1986) (plurality) (Brennan, J.)). "It is a particularly wilful type of recklessness that is inherent in the deliberate indifference standard." <u>Simmons v. City of Phila.</u>, 947 F.2d 1042, 1060 n.13 (3d Cir. 1991). That indifference must be attributed to "lawmakers or other officials with the authority to make municipal policy." <u>Id</u>. at 1059. Whether one has the authority to formulate official municipal policy is a matter of state law. <u>Id</u>. at 1061-62. The Third Circuit has held that "neither

26

[an unconstitutional municipal policy or custom] could be established absent conscious decision-making or acquiescence in a longstanding custom or practice on the part of a policymaker." Id. at 1064 (citing Andrews 895 F.2d at 1481.) (noting that negligence on the part of state officials is not enough to impute liability under § 1983.)  "Therefore, as to each of Plaintiff's allegations as a basis of municipal liability, he must: identify the constitutional right at issue, identify the policy or custom at issue, identify the policymaker, demonstrate deliberate indifference or evidence of knowledge and acquiescence by the policymaker and demonstrate causation." Glass v. City of Phila., 455 F. Supp. 2d 302, 342 (E.D. Pa. 2006).

The basis for Plaintiff's municipal liability claim is that Defendant Isdell, and the other named PIA Defendants, knew of, acquiesced, and participated in the retaliation and harassment of Plaintiff.  Plaintiff claims to provide substantial evidence that supports his contention, yet fails to explain how the information he provides serves as evidence to demonstrate deliberate indifference or evidence of knowledge and acquiescence by Defendants.  His list of "evidence," which fails to cite to any actual evidence, offers little factual support and does not cite anything the Court can rely on to make a decision.  The Court views Plaintiff's list as little more than general statements that have no defined evidentiary or probative value.  Therefore, this Court grants summary judgment in favor of Defendants as to Plaintiff's section 1983 claim against the City of Philadelphia and the individual Defendants in their official capacities.

## IV.  CONCLUSION

For the reasons set forth above, the Court finds that summary judgment as to Defendants, in their individual capacities, must be denied.  However, the Court grants summary judgment as to Defendants, in their official capacities.  An order follows.

**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| SAUL RAVITCH | : | |
| | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | CIVIL ACTION |
| | : | |
| CITY OF PHILADELPHIA, CHARLES | : | |
| ISDELL, MARK PESCE, THOMAS | : | |
| BECKER, CHRISTINE DERENICK- | : | NO. 06-3726 |
| LOPEZ, individually and as corporate | : | |
| officials for the City of Philadelphia | : | |
| | : | |
| Defendants. | : | |

## <u>ORDER</u>

**AND NOW**, this 31st day of March, 2009, upon consideration of Defendants' Motion for

Summary Judgment (Doc. No. 16), together with Defendants' Memorandum of Law in Support

thereof, Plaintiff's Response and Memorandum of Law in Opposition to the Motion and Cross-

Motion for Sanctions (Doc. No. 17), Defendants' Reply in Response to Motion for Summary

Judgment (Doc. No. 18), and Defendants' Cross Motion for Sanctions and Response in

Opposition to Plaintiff's Cross-Motion for Discovery Sanctions (Doc. No. 19),

it is hereby **ORDERED** that Defendants' Motion for Summary Judgment is:

1. **DENIED** as to Plaintiff's claim of a First Amendment violation against

   Defendants Isdell, Pesce, Becker, and Derenick-Lopez, in their Individual

   Capacities.

2.      **GRANTED** as to Plaintiff's claim of a violation of 42 U.S.C. § 1983

against Defendants City of Philadelphia, Isdell, Pesce, Becker, and

Derenick-Lopez in their Official Capacities.

It is **FURTHER ORDERED** that:

3.      Plaintiff's Cross-motion for Sanctions is **DENIED**; and

4.      As to Defendants' Cross Motion for Sanctions, the Defendant shall

produce the documents in question for *in camera* review within 10 days

from the date of this Order.

BY THE COURT:

_s/ Ronald L. Buckwalter_
RONALD L. BUCKWALTER, S.J.